Appellant=s Motion for Rehearing Overruled, Memorandum Opinion of May
28, 2009 Withdrawn, Affirmed and Substitute Memorandum Opinion filed July 9,
2009








 

Appellant=s Motion for Rehearing Overruled, Memorandum Opinion
of May 28, 2009 Withdrawn, Affirmed
and Substitute Memorandum Opinion filed July 9, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO.  14-07-00940-CR

NO.  14-07-00941-CR

____________

 

KEITH ROCHELL WOODS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
District Court

Harris County, Texas

Trial Court Cause Nos.  1114082
& 1114083

 



 

S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

Appellant=s motion for rehearing is overruled. 
We withdraw the memorandum opinion and vacate the judgment issued on May 28,
2009, and substitute this memorandum opinion and judgment in its place.








Keith Rochell Woods was arrested in 2007 for the illegal
possession of certain prescription-drug tablets.  Following a jury trial, he
was convicted on two counts: (1) possession of at least 400 grams of
alprazolam;  and (2) possession of at least 400 grams of dihydrocodeinone with
intent to deliver.  He was then sentenced to seventy years= confinement in the
Institutional Division of the Texas Department of Criminal Justice and assessed
a $10,000 fine on each count, with the sentences to run concurrently.  Woods
appeals these convictions contending that (1) the evidence was legally and
factually insufficient to prove beyond a reasonable doubt that he delivered the
tablets, and (2) the evidence was legally and factually insufficient to prove
beyond a reasonable doubt that the seized tablets contained at least 400 grams
of either alprazolam or dihydrocodeinone.  We affirm.

I

On April 25, 2007, Houston police officers John Huston and
Bradley Craig were conducting surveillance of Houston-area pharmacies.  A
seven-year veteran of the narcotics division, Officer Huston  knew that an
increasing amount of the prescription drugs being sold illegally in the
community were obtained by individual operators hiring groups of indigent or
otherwise homeless people to falsely pose as legitimate patients requiring
medication.  After obtaining prescriptions, they would typically have the
prescriptions filled at small, independent pharmacies and then deliver the
tablets to the operators in exchange for cash.








On this occasion, Officer Craig was observing Midtown
Pharmacy after receiving a tip about possible illegal narcotics activity.  He
saw three vehicles arrive at the pharmacy together.  He watched as the
occupants of all three vehiclesCincluding WoodsCcongregated
briefly near their vehicles, before all of themCexcept WoodsCwent inside the
pharmacy.  Shortly thereafter,  each of them emerged from the pharmacy carrying
a small white bag that appeared to contain a filled prescription.  They then
got back in their vehicles and left the pharmacy.  Officer Craig radioed for
assistance and followed the vehicles to their next destination, another
pharmacy located on Federal Road.[1]

Officer Huston took over the surveillance of the group as
they approached the second pharmacy.  He was joined by Officer M.T. McGivern
who observed the group from her own vehicle.  Both officers saw all three
vehicles arrive at the Federal Road pharmacy.  Officer McGivern described the
people accompanying Woods as Adirty,@ Adisheveled,@ Anot well-kept,@ and likely
homeless.  Both officers observed that, after the group emerged from their
vehicles, the individuals formed a line, and that Woods handed each of them
cash and a small piece of paper.  Each then went inside the pharmacy while
Woods waited outside.  Again, the officers saw each person emerge from the
pharmacy with a small white paper bag that resembled a filled prescription. 
Each then took his bag to the rear of Woods=s car and placed
it in his trunk.  Based on her experience and her observations of this
activity, Officer McGivern testified that Woods was clearly Arunning@ the operation.  








After everyone had returned from the pharmacy and placed
their white bags into Woods=s trunk, they returned to their cars and
left the pharmacy.  The three vehicles each went in separate directions.  Officers
Huston and McGivern chose to follow Woods, who was traveling with several
unidentified young women, and followed him to an Autozone store, also located
on Federal Road.  In the Autozone parking lot, the officers observed Woods meet
with a man driving a Ford Explorer.  This new individual, later identified as
Harold Johnson, opened the back of his Explorer.  Officer Huston observed Woods
reach into the trunk of his car, remove three large, black, plastic trash bags
and then hand them to Johnson.  Johnson then placed the bags in the back of his
Explorer.  After this transfer, the two men left the Autozone parking lot in
different directions.  Units of the Houston Police Department assisting
Officers Huston and Craig followed both Woods and Johnson. 

Johnson was stopped and arrested by another officer for a
traffic violation.  While Johnson was being detained, one of the officers
noticed a solitary pill lying on the passenger seat of the Explorer.  When the
police later conducted an inventory search of the Explorer, they recovered
$11,000 in cash, and three large, black, plastic trash bags.  Inside the three
trash bags were prescription bags holding about 5,000 tablets.  These tablets
were later identified as alprazolam (sold under the name AXanax@) and
dihydrocodeinone (sold under the name AVicodin@).  Woods was also
stopped and arrested, based on an outstanding warrant associated with his car. 

A Houston Police Department chemist determined that the
recovered tablets included about 2,600 grams of dihydrocodeinone and about 417
grams of alprazolam.  At trial, Officer Huston testified that, based on his
experience as a narcotics officer, the amount of tablets found in the Explorer
indicated that they were intended for delivery rather than personal use. 

Woods was later charged with two separate counts of
possession of at least 400 grams of alprazolam, and possession of at least 400
grams of dihydrocodeinone with intent to deliver.  Woods was tried before a
jury and convicted.  He was sentenced to seventy years= confinement in
the Institutional Division of the Texas Department of Criminal Justice plus a
$10,000 fine on each count, with the sentences to run concurrently.  This
timely appeal followed.

II








Woods contends that the evidence presented at trial was
legally and factually insufficient to prove beyond a reasonable doubt two
essential elements of the charged offenses: (1) that Woods delivered at least
400 grams of each type of drug to Harold Johnson, and (2) that the seized
tablets contained at least 400 grams of aprazolam and at least 400 grams of dihydrocodeinone.

In assessing the legal sufficiency of the evidence to
support a criminal conviction, we consider all the evidence in the light most
favorable to the verdict and determine whether, based on that evidence and
reasonable inferences therefrom, a rational juror could have found the
essential elements of the crime beyond a reasonable doubt.  Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443
U.S. 307, 318B19 (1979)); Powell v. State, 194 S.W.3d 503,
506 (Tex. Crim. App. 2006); Wooten v.  State, 267 S.W.3d 289, 294 (Tex.
App.CHouston [14th
Dist.] 2008, pet.  ref=d).  The reviewing court must give
deference to A>the responsibility of the trier of
fact to fairly resolve conflicts in testimony, to weigh the evidence, and to
draw reasonable inferences from basic facts to ultimate facts.=@ Hooper,
214 S.W.3d at 13 (quoting Jackson, 443 U.S. at 318B19).  In reviewing
the sufficiency of the evidence, we should look at A>events occurring
before, during and after the commission of the offense and may rely on actions
of the defendant which show an understanding and common design to do the
prohibited act.=@  Id. (quoting
Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985).  The issue
on appeal is not whether we, as a court, believe the State=s evidence or
believe that appellant=s evidence outweighs the State=s evidence.  Wicker
v. State, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984); Wooten, 267
S.W.3d at 294.  The verdict may not be overturned unless it is irrational or
unsupported by proof beyond a reasonable doubt.  Matson v. State, 819
S.W.2d 839, 846 (Tex. Crim. App. 1991); Wooten, 267 S.W.3d at 294. When
faced with conflicting evidence, we presume the trier of fact resolved
conflicts in favor of the prevailing party.  Turro v. State, 867 S.W.2d
43, 47 (Tex. Crim. App. 1993); Wooten, 267 S.W.3d at 294.  Therefore, if
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt, we must affirm. McDuff v. State, 939 S.W.2d
607, 614 (Tex. Crim. App. 1997); Wooten, 267 S.W.3d at 294.








When reviewing a factual‑sufficiency challenge, we
view all the evidence neutrally. Prible v. State, 175 S.W.3d 724, 730B31 (Tex. Crim.
App. 2005); Newby v. State, 252 S.W.3d 431, 435 (Tex. App.CHouston [14th
Dist.] 2008, pet. ref=d).  We especially discuss and examine the
specific evidence that the appellant contends undermines the jury=s verdict. Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); Newby, 252
S.W.3d at 435.  We may set aside the verdict if the evidence is so weak that
the verdict is clearly wrong and manifestly unjust, or if the verdict is
against the great weight and preponderance of the evidence.  Watson v. State,
204 S.W.3d 404, 414B15 (Tex. Crim. App. 2006); see also
Newby, 252 S.W.3d at 435. We may disagree with the jury=s conclusions;
however, we must avoid substituting our judgment for that of the jury,
particularly in matters of credibility. Drichas v. State, 175 S.W.3d
795, 799 (Tex. Crim. App. 2005); see also Newby, 252 S.W.3d at 435.

A

In his first issue, Woods contends that the evidence was
both legally and factually insufficient to prove beyond a reasonable doubt that
at least 400 grams of each type of the seized tablets came from him. 
Specifically, Woods asserts that while it is undisputed that more than 5,000
tablets were recovered from Johnson=s Explorer, there
was conflicting evidence as to what, if any, contact Woods may have had with
the tablets sufficient to support his conviction. 

1








A person commits an offense if he knowingly or
intentionally possesses a material containing alprazolam without a valid
prescription.  See Tex. Health & Safety Code Ann. __ 481.117(a), 481.104(a)(2) (Vernon
2003).  A
person may also commit an offense if he knowingly or intentionally possesses
with the intent to deliver a material containing dihydrocodeinone.  See id.
__ 481.114(a), 481.104(a)(4) (Vernon
2003).  In each case, Apossession@ means the actual care, custody, control, or management of
the controlled substance in question.  Id. _ 481.002(38) (Vernon Supp. 2008); Evans
v. State, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006).

Juries are permitted to make reasonable inferences from the
evidence presented at trial, and circumstantial evidence is as probative as
direct evidence in establishing the guilt of an actor. Hooper, 214
S.W.3d at 14B15.  In fact, circumstantial evidence alone can be
sufficient to establish guilt.  Id. at 15.  In such cases, the
sufficiency-of-the-evidence standard of review for circumstantial evidence is
the same as in direct-evidence cases.  Id. at 13.  Under the Jackson test,
we permit juries to draw multiple reasonable inferences as long as each
inference is supported by the evidence presented at trial.  Id. at 15. 
But juries are not permitted to come to conclusions based on mere speculation
or factually unsupported inferences or presumptions.  Id.   In a
sufficiency review, courts of appeals should determine whether the necessary
inferences are reasonable based upon the combined and cumulative force of all
the evidence when viewed in the light most favorable to the verdict.  Id. 
at 16B17.  








In an
illegal-possession case, whether the evidence is direct or circumstantial, it
must establish that the appellant=s connection with the contraband was
more than fortuitous.  Evans, 202 S.W.3d at 161.  Moreover, when the
accused is not in exclusive possession of the place where contraband is found,
the State must show additional affirmative links between the accused and the
contraband.  Olivarez v. State, 171 S.W.3d 283, 291 (Tex. App.CHouston [14th Dist.] 2005, no pet.). 
This Aaffirmative links@ rule protects an innocent bystander
from conviction merely because of his fortuitous proximity to someone else=s drugs.  Evans, 202 S.W.3d at
161B62.  In deciding whether the evidence
is sufficient to link the accused to the contraband, the trier of fact is the
exclusive judge of the credibility of the witnesses and the weight to be given
to their testimony.  Poindexter v. State, 153 S.W.3d 402, 406 (Tex.
Crim. App. 2005); Cuong Quoc Ly v. State, 273 S.W.3d 778, 781 (Tex. App.CHouston [14th Dist.] 2008, pet. ref=d). 

The following list of relevant factors may affirmatively
link an accused to contraband: (1) the defendant=s presence when a
search is conducted; (2) whether the contraband was in plain view; (3) the
defendant=s proximity to and the accessibility of the narcotic;
(4) whether the defendant was under the influence of narcotics when arrested;
(5) whether the defendant possessed other contraband or narcotics when
arrested; (6) whether the defendant made incriminating statements when
arrested; (7) whether the defendant attempted to flee; (8) whether the
defendant made furtive gestures; (9) whether there was an odor of contraband;
(10) whether other contraband or drug paraphernalia were present; (11) whether
the defendant owned or had the right to possess the place where the drugs were
found; (12) whether the place where the drugs were found was enclosed; (13)
whether the defendant was found with a large amount of cash; and (14) whether
the conduct of the defendant indicated a consciousness of guilt.  Cuong Quoc Ly, 273 S.W.3d at 781B82; Olivarez, 171 S.W.3d at
291.  But these are simply some factors which may circumstantially establish
the legal sufficiency of the evidence to prove a knowing Apossession.@  They should not
amount to a litmus test.  Evans, 202 S.W.3d at 162 n.12.  We focus not
on the number of linking factors present but, rather, the Alogical force@ they create to
prove the crime was committed.   Cuong Quoc Ly, 273 S.W.3d at 782. 








In Valencia v. State, the defendant met
another individual in a parking lot while the two were being observed by a DEA
agent.  51 S.W.3d 418, 420B21 (Tex. App.CHouston [1st
Dist.] 2001, pet. ref=d).  The person the defendant met opened
the hatchback of the defendant=s car and removed a black bag from the
car.  Id. at 421.  Fifteen minutes later, this individual was stopped by
the DEA; the black bag was no longer in the car, but a female passenger who had
not been in the car previously was present. Id. The black bag later was
found in an apartment leased by the female passenger; it contained more than
eight kilograms of cocaine.  Id.  The defendant in Valencia was
arrested later at a grocery store.  Id.  Just one day earlier, the
defendant had picked up a black bag and a large sum of money from the
individual he met while under observation.  Id. at 421, 423.  The
evidence in Valencia was held to be legally and factually sufficient to
support the jury's finding that the defendant was affirmatively linked to the
cocaine.  Id. at 423.

The circumstances here parallel those in Valencia. 
The cocaine in Valencia was found in a bag recently removed from the
defendant=s car.  See id.  In this case, police officers
found the contraband tablets inside three black, plastic trash bags seized just
a short time after they had witnessed Woods deliver three black, plastic trash
bags to Johnson in the Autozone parking lot.  The tablets had been transported
to Johnson in the trunk of Woods=s car.  Therefore,
the tablets were immediately accessible to Woods in the same manner that the
cocaine was in Valencia.  See id.  Further, as the tablets were
transported in Woods=s car, they were under Woods=s control before
being delivered to Johnson.  Also, in Valencia, the police had observed
the defendant pick up the black bag and a significant sum of money the day
before the transaction took place.  In this case, the police observed multiple
individuals deposit prescription bags into the trunk of Woods=s car.  But when
Woods=s car was searched
after his arrest, and after the exchange with Johnson, no tablets were found. 
Finally, in both cases, the large quantity of contraband makes it even more
unlikely that their presence was accidental.  








Other links in this case create an even stronger
association than that found in Valencia.  In that case, the police
actually lost visual contact with the defendant as they followed him after the
transaction.  Here, police officers followed Woods to the Autozone parking lot,
maintaining constant surveillance of him throughout the journey.  And after the
exchange with Johnson, police again maintained constant surveillance of both
cars before arresting both men and searching their vehicles.  Additionally, in
this case the police observed Woods personally directing several persons to
enter a pharmacy and then deposit their filled prescriptions into the trunk of
his car.

Woods asserts in his motion for rehearing that none of the
prescriptions found in the bags recovered from Johnson=s Explorer
correspond to AMAPPS Pharmacy,@ the one location
where officers Huston and McGivern testified they saw prescription bags placed
directly into the trunk of Woods=s car.  Because
none of the bags Acame from Mapp Pharmacy,@ Woods contends,
the recovered pills could not be traced back to the pharmacies where Woods was
observed.  At trial, the State introduced into evidence Exhibit 24, a
collection of prescription receipts recovered from the three black bags found
in Johnson=s Explorer.  Specifically, Exhibit 24 contained
twenty-two receipts from  Midtown Pharmacy, eight receipts from Mercury
Pharmacy, and nineteen receipts from AMaswoswe=s Alt Pharmacy
Svcs.@[2]  As stated above,
during the trial it was primarily counsel for the State and Woods that referred
to the second-observed pharmacy as AMAPPS Pharmacy.@  The police
officers, on the other hand, testified to observing Woods at the AMidtown Pharmacy@ and a second
pharmacy, which they generally identified by its location Aon Federal Road.@  The receipts
from the Maswoswe pharmacy state its address as A911 Federal Road.@  Further, we
observe that the initials for the Maswoswe pharmacy are M.A.P.S.  Consequently,
it was not a stretch of logic for the jury to infer that, in fact, the pharmacy
on Federal RoadCor the AMAPPS Pharmacy@Cwas the pharmacy
referred to on its receipts as AMaswoswe Alt Pharmacy Svcs.@  Indeed, nineteen
receipts from AMaswoswe Alt Pharmacy Svcs@ at 911 Federal
Road were recovered from Johnson=s Explorer and
admitted into evidence.[3]








The evidence that Woods actively participated in both the
acquisition and exchange of the tablets was sufficient to demonstrate that his
connection with the contraband was more than fortuitous.  See Evans, 202 S.W.3d at 161B62; Cuong Quoc Ly, 273 S.W.3d at 781B82; Valencia,
51 S.W.3d at 420B23; see also Davis v. State, 923
S.W.2d 781, 786B87 (Tex. App.CBeaumont 1996), rev=d on other grounds, 947 S.W.2d 240
(Tex. Crim. App. 1997) (despite the fact that car was not owned by defendant,
the fact that he had driven car to New York and back was legally sufficient to
affirmatively link defendant to marijuana found in trunk).  Viewing the
evidence here in the light most favorable to the State, we believe that a rational
jury could have found beyond a reasonable doubt that the appellant was
affirmatively linked to the tablets found in Johnson=s Explorer.  See
Hooper, 214 S.W.3d at 13; Wooten, 267 S.W.3d at 294.  Therefore, the
evidence of Woods=s possession was legally sufficient to
support the jury=s verdict beyond a reasonable doubt.  See
McDuff, 939 S.W.2d at 614; Wooten, 267 S.W.3d at 294.

2

Woods challenges the factual sufficiency of the State=s evidence as to
his connection to the tablets in several ways.  First, Woods contends that
there was conflicting evidence concerning exactly how many trash bags were
delivered to Johnson in the Autozone parking lot.  Further, Woods argues that
because more than three black, plastic trash bags were discovered in the back
of Johnson=s Explorer, it was impossible for the witnesses to
know that Johnson received the bags containing the tablets from Woods, as
opposed to already possessing them before their meeting.  Finally, Woods
asserts that no witness could testify as to exactly what was in the bags that
Woods handed to Johnson.  As a result, Woods argues, the jury was required to
speculate as to both what was in the bags that appellant delivered, and that
those were the exact bags later discovered with the tablets inside Johnson=s Explorer.








On appeal, and again in his motion for rehearing, Woods
contends that the State failed to prove beyond a reasonable doubt that Woods
delivered three bags to Johnson, and therefore failed to establish an
affirmative link between Woods and the pills recovered from Johnson=s Explorer.  At
trial, Officer Huston testified on direct examination that he saw Woods take AthreeCappeared to be
three large plastic garbage type bags,@ which he then
handed to another man, later identified as Johnson.  On cross-examination,
Huston stated that there were Aseveral black trash bags,@ and that they
were Abundled together.@ When asked by
defense counsel if it was Atwo to three black trash bags,@ Huston replied, AYes.@  Woods asserts
that this statement by Huston amounted to a Aretraction@ of his earlier
testimony.  But Huston never stated that his earlier testimony was inaccurate. 
In fact, Huston=s response to Wood=s defense counsel
was not inconsistent with his prior testimony that Woods= had deliver to
Johnson what Aappeared to be three@ bags.  Huston never
stated that only two bags were exchanged.  We presume the jury evaluated this
testimony in reaching its verdict.  We should not intrude upon the jury=s role as the sole
judge of the weight and credibility given to the evidence and any witness=s testimony. Johnson
v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); see also Gant v. State,
278 S.W.3d 836, 839 (Tex. App.CHouston [14th Dist.] 2009, no pet.) (AWe give deference
to the jury=s determinations, particularly those concerning the
weight of the evidence and the credibility of witness testimony.@).  A>A jury=s decision is not
manifestly unjust merely because the jury resolved conflicting views of
evidence in favor of the State.=@  Kromah v.
State, 283 S.W.3d 47, 50 (Tex. App.CHouston [14th
Dist.] 2009, pet. ref=d) (quoting Johnson v. State, 176
S.W.3d 74, 78 (Tex. App.CHouston [1st Dist.] 2004, pet. ref=d)). 








There was no testimony to contradict the evidence that
filled prescriptions were deposited into the trunk of Woods=s car while at the
Federal Road pharmacy.  It was also undisputed that, although Houston police
officers rotated their surveillance of Woods while traveling from the Federal
Road pharmacy to Autozone,[4]
at no time was Woods unobserved by officers participating in the
investigation.  Finally, it was undisputed that no prescriptions were recovered
from Woods=s car when he was ultimately arrested, again after
uninterrupted surveillance.  At trial, Woods=s trial counsel
questioned Officer Huston as to why the female passengers in Woods=s car were never
searched, and why the trash bags were never fingerprinted.  But no one saw the
passengers ever remove anything from Woods=s trunk.  And
there was no testimony that anyone other than Woods or Johnson ever handled the
trash bags. Therefore, it was reasonable for the jury to infer that the
prescriptions deposited into Woods=s trunk at the
Federal Road pharmacy must have been removed when Woods handed the trash bags
to Johnson in the Autozone parking lot, as this was the only time any of the
witnesses described seeing anything removed from Woods=s trunk.  








At trial, and again on appeal, Woods contends that there
were Aquite a number of
black plastic trash bags@ in Johnson=s Explorer, making
it impossible for the jury to know which bags came from Woods.  But this
argument confuses Woods=s assertions with the actual testimony of
the witnesses.   At trial, Officer Huston testified that there were three black
trash bags in the back of Johnson=s Explorer.  When
pressed by Woods=s trial counsel on cross-examination,
Officer Huston stated that, although there was other property in the back of
the Explorer, there were only three black trash bags.  When recalled and
questioned again by Woods=s trial counsel a day later, Officer
Huston insisted still that there were only three black trash bags in the
vehicle.  Officer Nash Patel also testified to seeing only three black trash
bags.  When asked by Woods=s trial counsel if he could see any other
black trash bags in a photograph of Johnson=s Explorer
displayed during cross-examination, Officer Patel stated, AI see three for
sure.  I can=t tell what=s in the back.  I
don=t know if that=s trash bags or
not.@  Officer McGivern
first testified that she saw two black trash bags in the Explorer.  When shown
the photograph of Johnson=s vehicle Officer McGivern stated that she
saw AthreeCmaybe four trash
bags.  Possibly more.@  As the jury is free to believe or
disbelieve all or part of a witness=s testimony, the
jury in this case could reasonably find, based on all of the witnesses= testimony, that
there were only three black trash bags found in the back of Johnson=s Explorer.

Woods=s second basis for attacking the
State=s evidence is through Johnson=s testimony.  Johnson testified
that the appellant occasionally worked for him selling clothes, and that he met
Woods in the Autozone parking lot on the day in question to pick up some coat
hangers.  According to Johnson, when Woods brought him hangers, he usually
brought them in black trash bags.  Johnson repeatedly denied knowing anything
about the seized tablets, or how they got into his Explorer.   But during
cross-examination, Johnson made the following admission:

I don=t know what [Woods] was doing.  I
just met him to get the pillsCthe bag you saying there were pills in there, what was put
in my car, I don=t know.

The jury, as the trier of fact, Ais the sole judge
of the credibility of the witnesses and of the strength of the evidence.@  Fuentes v.
State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999); Wooten, 267
S.W.3d at 294.  Therefore the jury was free to believe either the police
officers or Johnson regarding the events on the day in question.

A neutral review of the evidence in this case supports
Woods=s Aaffirmative links@ to the tablets
seized from Johnson=s Explorer.  We cannot say that the
evidence in this case is so weak that the verdict is clearly wrong and manifestly
unjust, or is against the great weight and preponderance of the evidence. 
Therefore, we find the evidence to be factually sufficient to support a finding
of guilt beyond a reasonable doubt.  See Watson v. State, 204 S.W.3d at
414B15; Newby,
252 S.W.3d at 436. We overrule Woods=s first issue. 

B








In his second issue, Woods contends that the evidence was
both legally and factually insufficient to prove beyond a reasonable doubt that
the recovered tablets were, in fact, the substances charged in the indictment. 
Specifically, Woods argues that the prosecution=s expert witness,
chemist Ahtavea Barker of the Houston Police Crime Lab, failed to explicitly
testify that she had performed a chemical test on the seized tablets.  Further,
Woods argues that Ms. Barker used an ineffectively small sample size in her
analysis, preventing her from conclusively identifying the tablets.  In
response, the State asserts that Woods=s argument
misinterprets Ms. Barker=s testimony, as well as  misstates the
applicable legal standards.

1

As a preliminary matter, it bears noting that Woods does
not challenge either Ms. Barker=s qualifications as an expert, or the
scientific basis of the applied analysis.  Rather, Woods has restricted his
appeal to the adequacy with which Barker identified the substances in
question.  








On appeal, Woods cites both Curtis v. State, 548
S.W.2d 57 (Tex.  Crim.  App.  1977), and Steele v. State, 681 S.W.2d 129
(Tex. App.CHouston [14th Dist.] 1984, pet. ref=d), as authority
for his assertion that A[p]roof beyond a reasonable doubt normally
requires a chemical analysis to prove that the substances seized are, in fact,
the substances charged in the indictment.@  But both cases
are factually dissimilar from the present case in significant ways.  In Curtis,
the Court of Criminal Appeals held that testimony from an Aexperienced
narcotics officer@ visually identifying a Awhite or brown
powdered substance@ as heroin was insufficient to prove the
identity of the charged substance by even a preponderance of the evidence.[5] 
Curtis, 548 S.W.2d at 59.  Likewise, in Steele, this court
reversed a conviction in which the only evidence specifically identifying the
substance in question was a statement by an investigating officer that the
defendant had referred to the Awhite powder@ as cocaine.  Steele,
681 S.W.2d at 131.  The Steele court stated that although a police
laboratory chemist testified at trial, the State never elicited any testimony
from her to establish that the substance was, in fact, cocaine.  Id. 
Neither of these cases stand for the proposition that chemical testing is
absolutely necessary to prove guilt beyond a reasonable doubt.  Rather, the Curtis
court inferred the opposite by restating the long-held rule that an
experienced officer may be qualified to testify that a certain green leafy
plant substance is marijuana, based solely on a visual inspection, even if a
visual inspection is insufficient to prove that a bag of powder is actually
heroin.  Curtis, 548 S.W.2d at 59; accord Fierro v. State, 706
S.W.2d 310, 318 (Tex. Crim. App. 1986).  Moreover, Woods himself states in his
brief that, Aa comparison of the tablets seized in this case with
descriptions or photographs from some standard reference such as the Physician=s Desk Reference
might have provided at least some evidence supporting the verdict.@  See Manning
v. State, 637 S.W.2d 941, 943 (Tex. Crim. App. 1982). 

At trial, Barker described the process she generally
applies in controlled-substance cases, as well as the specific actions she took
with the tablets seized from Johnson=s Explorer.  She
described how, in Atablet cases,@ she looks at
every single tablet to confirm the conformity of shape, color, logo, and
general quality.  This information is then compared with pharmaceutical product
information in order to identify the substance of the tablets.  In this case,
Barker testified that she identified all of the seized tablets as belonging to
one of three categories: either one type of dihydrocodeinone or one of two
types of alprazolam, each of these tablets being characterized by different
colors, shapes and manufacturer logos.  Such a thorough examination and
comparative analysis is closer to the standard Woods suggests, see Manning,
637 S.W.2d at 943, rather than the speculative assessments dismissed by Curtis
and Steele. 








But even if we were to accept that chemical testing were
required to support the conviction in this case, Ms. Barker also described her
analysis as including certain  Aconfirmatory tests.@  Specifically,
Barker referred to performing a gas-chromatograph-mass-spectrometry test, an
instrumental test in which substances are reduced into their separate
components and are then identified according to their spectral fragmentation
pattern.  

Woods contends that Barker never explicitly stated that
this gas-chromatograph-mass-spectrometry test was ever performed.  However, the
following exchange suggests otherwise:

PROSECUTOR:      In State=s Exhibit 28 [the unique lab
report], did you do an analysis of all the tablets there in that big container?

BARKER:               Yes.

PROSECUTOR:      And what were
those two types?

BARKER:               The first was
hydrocodoneCor dihydrocodeinone.  It=s generic Vicodin.  The other one
is alprazolam, known as Xanax. 

PROSECUTOR:      In both of those
cases, did you perform an initial check of the pills to determine what type
they were?

BARKER:               Yes.  I did a
preliminary examination for each of them based on their logos and their shape
and color.

PROSECUTOR:      Okay.  And after
you did that, did you perform a specific analysis, like you talked about to
confirm thatCwhat you had found?

BARKER:               Yes.  On each
type as well as each logo.

 








In her testimony, Barker states that she performed both a
preliminary visual inspection of the tabletsCobserving their
size, shape, and colorCand then performed a Aspecific analysis.@  This statement
relates to her prior testimony in which, when asked if she conducted a more Ain-depth analysis,@ she described the
gas-chromatograph-mass-spectrometry test as Aa specific
instrumental test.@  Woods suggests that we require
testifying experts to Aunambiguously swear that >I performed the
mass spectrometry test,= >I followed the
procedures designed to reach an accurate result,= and >I tested these
particular tablets and obtained a positive result.=@ However, he
offers no authority for such a requirement.  We decline Woods=s invitation to
require the use of such Amagic words@ to prove the
identity of the substance in question.   

Woods also challenges the legitimacy of the sample sizes
Barker used in her analysis of the seized tablets.  At trial, Barker testified
that she used one tablet from each  type of the tablets seizedCone type of
dihydrocodeinone and two types of alprazolam.  A conviction for possession of a
controlled substance may be based on the testing of a representative amount of
a homogenous substance found in a container in the possession of a defendant.  Avington
v. State, No.  14-08-00122-CR, 2008 WL 5086003, at *3 (Tex. App.CHouston [14th
Dist.] Nov.  25, 2008, no pet.)  (mem.  op., not designated for publication)
(citing Melton v. State, 120 S.W.3d 339, 342B44 (Tex. Crim.
App. 2003)).  Woods argues that this small sample size was inadequate to assess
the identity of over 5,000 tablets.  But the manner of testing a substance by
random sampling goes only to the weight the jury may give to the tested
substances in determining that the untested substance is the same as the tested
substance.  Zone v. State, 118 S.W.3d 776, 777 (Tex. Crim. App. 2003). 
As discussed earlier, Barker had already testified as to her visual examination
of the tablets, dividing them into three groups based on their conformity of
color, shape, and logo.  Barker had also testified about being able to
recognize the difference between manufactured tablets, and illicit or illegally
made ones.  According to her testimony, there were only three types of tablets
in the total seizure and she sampled each type.     

The jury was free to judge Barker=s credibility as
well as the strength of the evidence.  See Fuentes, 991 S.W.2d at 271; Wooten,
267 S.W.3d at 294.  Based on this evidence, we cannot say that the verdict was
irrational or unsupported by proof beyond a reasonable doubt.  Therefore, we
must hold that Barker=s testimony was legally sufficient to
support the verdict beyond a reasonable doubt.  Matson, 819 S.W.2d at
846; Wooten, 267 S.W.3d at 294.








2

Appellant did not present any conflicting evidence or
attempt to test the substances himself to establish that the recovered tablets
were not either alprazolam or dihydrocodeinone.  See Jones v.  State,
No.  01-06-01159-CR, 2008 WL 525696, at *6 (Tex. App.CHouston [1st
Dist.] Feb. 28, 2008, pet. ref=d) (mem. op., not designated for
publication) (citing Gabriel v. State, 900 S.W.2d 721, 722 (Tex. Crim.
App. 1995) (holding that evidence was sufficient when the State tested only
five of 54 bags containing cocaine and noting that Aappellant could
have conducted independent chemical tests on all fifty‑four [bags] to
show they did not contain the same substance@)).  Therefore,
the evidence, when viewed in a neutral light, shows that the jury=s verdict neither
was against the great weight and preponderance of the evidence nor seems
clearly wrong or manifestly unjust.  Watson, 204 S.W.3d at 414B15.  We conclude
that the State presented factually sufficient evidence that appellant possessed
more than 400 grams of both alprazolam and dihydrocodeinone.

Woods=s second issue is overruled.

* * *

Having overruled both of Woods=s issues, we
affirm the trial court=s judgment.

 

 

 

 

/s/      Jeffrey V. Brown

Justice

 

 

 

 

Panel consists of
Chief Justice Hedges and Justices Guzman and Brown.

Do Not Publish C Tex.  R.  App.  P.  47.2(b).









[1]  At trial, counsel for both the State and Woods
referred to this second pharmacy interchangeably as either the AFederal Road pharmacy@ or the AMAPPS Pharmacy.@ 
But the police officers involved in the investigation and arrest of Woods
generally referred to this second location by its geographic location, Aon Federal Road.@ 
On one occasion, Officer Huston even went so far as to confirm that a reference
by defense counsel to the AMAPPS Pharmacy@ was, in fact, the pharmacy located Aon Federal Road.@ 





[2]  It bears noting that, upon examination of these
receipts, all of the prescriptions were filled on April 25, 2007; every
individual received a prescription of both alprazolam and dihydrocodeinone; all
of the prescriptions were written by the same physician; and almost all of the
individuals received identical prescriptions from two different pharmacies. 





[3]  The trial record does not indicate that trial
counsel for the State or defense, or any testifying witness, ever demonstrated
the proper spelling of AMAPPS Pharmacy.@ 
Consequently, it is possible that the court reporter simply erred in using two
P=s in spelling AMAPPS.@   





[4]  Several officers testified that, when traveling
between destinations, they utilized a following technique wherein one officer
would follow the suspect for some distance before passing the suspect=s vehicle off to another officer.  The purpose of this
technique is to avoid detection by the suspect being followed.  Consequently,
multiple officers were involved in following the suspect from one location to
another, resulting in continuous, yet undetected, surveillance. 





[5]  In Curtis, the prosecution also relied upon
unobjected-to hearsay statements by the Aexperienced
narcotics officer@ that a DEA lab chemist had personally told him that
the substance in question was heroin.  See Curtis, 548 S.W.2d at 59. 
The Court of Criminal Appeals also rejected this testimony as having Ano probative value.@  Id.